U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

SEP 3 0 2010

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ROBERT DEAN SCHOOLER and | § | CASE NO. 01-51003-RLJ-7 |
| TINA MARIE SCHOOLER, | § | |
| | § | |
| DEBTORS | § | |
| | § | |
| UNITED STATES OF AMERICA by | § | |
| LAMESA NATIONAL BANK, | § | |
| | § | |
| PLAINTIFF | § | |
| | § | |
| VS. | § | ADVERSARY NO. 09-05011 |
| | § | |
| LIBERTY MUTUAL SURETY, | § | |
| | § | |
| DEFENDANT | § | |

## MEMORANDUM OPINION

Trial of this adversary proceeding was held on May 28, 2010, after which the Court granted the parties' request to file post-trial briefs; upon receipt of the briefs, the Court took the matter under advisement. By this suit, the plaintiff, Lamesa National Bank ("LNB"), seeks

recovery from the defendant, Liberty Mutual Surety ("Liberty Mutual"), which is the surety under the blanket bond issued to cover bankruptcy trustees serving the bankruptcy court for the Northern District of Texas. LNB, in accordance with Bankruptcy Rule 2010(b), brings this suit in the name of the United States.[1]

In accordance with the Court's findings of fact and conclusions of law set forth below, the Court has determined that Liberty Mutual is obligated under the bond, but such obligation runs in favor of the bankruptcy estate, not LNB. Liberty Mutual is directed to remit the sum of $112,247.66 to the bankruptcy estate of the debtors, Robert Dean Schooler and Tina Marie Schooler.

The Court has jurisdiction over this matter under 28 U.S.C. § 1334(b); this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). This Memorandum Opinion and Order contains the Court's findings of fact and conclusions of law. FED. R. BANKR. P. 7052.

## Statement of Facts

1. The August 21, 2001 Bankruptcy Filing, the Bond, and the Parties

Robert and Tina Schooler filed their chapter 7 bankruptcy case on August 21, 2001; immediately after the filing, the chapter 7 case trustee (the "Trustee") was appointed. LNB is an unsecured creditor of the Schoolers; it has filed four proofs of claim in the case that, when added together, total $143,644.00.

Liberty Mutual is the surety and the Trustee is the principal on the blanket bond issued by Liberty Mutual to the United States under the names of the trustees specifically scheduled under

---

[1] Rule 2010(b) provides: "A proceeding on the trustee's bond may be brought by any party in interest in the name of the United States for the use of the entity injured by the breach of the condition." FED. R. BANKR. P. 2010(b).

the bond, including the Trustee. *See* Plaintiff's Exhibit 32. The bond provides that the Trustee, as principal, and Liberty Mutual, as surety, are "bound unto" the United States "for the payment of which well and truly to be made, . . . jointly and severally, firmly by these presents. The joint and several liability is between each trustee and the surety." *Id.* The bond further provides that, "as a condition to serving in the capacity as Trustee, Section 322 of the Bankruptcy Code requires that said Principal provide a surety bond for the *faithful performance* of [her] official duties as Trustee of the estates of . . . debtors assigned to the Principal by the United States Trustee." *Id.* (emphasis added). Finally, the bond states, "if said Principals shall faithfully perform their official duties and orders issued by the Court as Trustee, then this obligation shall be null and void; otherwise to remain in full force and effect." *Id.* The liability to the surety is limited per case and in the aggregate to $300,000.00 and $8,000,000.00, respectively.

The Trustee is an attorney that, in addition to serving as a case trustee in chapter 7 bankruptcy cases, has a law practice that includes collection and probate work.

2. Death of Hank Gremminger and Application to Probate Gremminger Will – November 2, 2001 to November 8, 2001

Hank Gremminger ("Gremminger"), father of Tina Schooler, died on November 2, 2001, just over two months after the Schoolers' chapter 7 bankruptcy filing. Tina Schooler and her sister, Kim McWilliams, were the beneficiaries under Gremminger's will – Tina received an undivided one-half of Gremminger's estate, with the other half to be held in trust for the benefit of Kim McWilliams and her son, Timothy Chase McWilliams. *See* Plaintiff's Exhibit 2. Tina Schooler was named the executrix under the will. In the event she was unable to serve as executrix, John Westhoff, an attorney who was designated as the trustee of the trust for Kim McWilliams and Timothy Chase McWilliams, was named an alternate executor. *Id.*

- 3 -

Six days after Gremminger's death, on November 8, 2001, Tina Schooler filed an application to probate Gremminger's will. *Id.*

### 3. Warnings to Trustee – November 28, 2001 to February 11, 2002

As a major unsecured creditor in the Schoolers' bankruptcy case, LNB was aware of the bankruptcy estate's rights to Tina Schooler's inheritance from Gremminger. By letter dated November 28, 2001 from Riley Nix, counsel for LNB, to the Trustee, Nix stated as follows:

> I have done some research regarding the bankruptcy estate's interest in Mrs. Schooler's entitlement to property under the will of Charles H. "Hank" Gremminger, Jr. . . . I believe that the debtors' duty to disclose their entitlement to an inheritance in their schedules and the estate's entitlement to the inheritance is clear. Rule 1007(h) of the Federal Rules of Bankruptcy Procedure places a duty on the debtors to amend their schedules within ten days of her becoming aware of her entitlement to the deceased's property. This has not been done. I think this raises some issues with regard to the debtors' entitlement to a discharge in this case. Section 541(a)(5)(A) of the Bankruptcy Code makes Mrs. Schooler's entitlement a part of the bankruptcy estate as long as the entitlement arose within 180 days of the filing of the bankruptcy. This case was filed on August 21, 2001 and Mr. Gremminger died on November 2, 2001, so I believe this requirement has clearly been met. It is, therefore, clear that the debtors must disclose information relating to the estate's assets and that the estate has an interest in the inheritance.
>
> The most aggressive position that you, as Chapter 7 Trustee, can take in this probate is to assert that you are entitled to be executor of the probate estate . . . . The benefit to such action would be your having direct control over the assets and having the ability to control the timing of the activities in the probate court.

Plaintiff's Exhibit 5. The hearing on Schooler's application to admit Gremminger's will to probate was set the next day, November 29, 2001, which Nix acknowledged presented a practical problem to having the Trustee appointed as a replacement executor. He therefore suggested an alternate course of action.

> Another possible way to assume the position would be to allow the probate court to appoint her, to allow letters to issue, assert that you automatically step into her shoes as the executor pursuant to sections 541(a)(1) and 541(d) of the Bankruptcy Code, and file a motion for turnover with the bankruptcy court pursuant to section 542 or

- 4 -

543. There may be some other ways to get to the same position (e.g., have Mrs. Schooler removed and replaced pursuant to Texas Probate Code section 222), but I think these are the most straight forward and least burdensome.

*Id.* Finally, Nix suggested that "some discovery should be done in order to ascertain the nature of the assets involved . . . and those that will pass as the result of a non-testamentary transfer, such as certain bank accounts, insurance policies, retirement accounts, and stock or mutual fund accounts." *Id.*

The next day, November 29, 2001, Nix sent a letter to John Westhoff, who was also serving as attorney for Tina Schooler in her application to probate Gremminger's will. Nix's letter warned Mr. Westhoff that Tina Schooler had not advised the Trustee of the inheritance, the inheritance passed to the bankruptcy estate, the Trustee was entitled to take control over the probate estate, and she (Tina Schooler) was accountable "to the U.S. Bankruptcy Judge for any proceeds received from this Estate or otherwise since the filing of her bankruptcy." Plaintiff's Exhibit 24. The Trustee was sent a copy of this letter.

Tina Schooler initially took the position that she could disclaim the inheritance. *See* Plaintiff's Exhibit 25. (If she could disclaim the inheritance, it would arguably prevent the inheritance from passing to the bankruptcy estate and thus eliminate her requirement to file amended bankruptcy schedules disclosing the inherited assets.) The Trustee, by letter dated December 4, 2001 to Mike Calfin, the Schoolers' bankruptcy counsel, disputed this claim.

I am in receipt of your letter dated November 30, 2001 in which you indicate you believe Tina Schooler has a right to disclaim any inheritance from her father, Charles H. "Hank" Gremminger, Jr. I disagree. It is my position that any attempt to disclaim constitutes an unauthorized transfer of bankruptcy estate property subject to avoidance under 11 U.S.C. § 549. . . . Here, we are talking about an after-acquired interest which becomes part of the bankruptcy estate under 11 U.S.C. § 541. Since the inheritance belongs to the bankruptcy estate and not the debtor, any attempt on the part of the debtor to disclaim is ineffective.

*Id.* The Trustee emphasized the requirement that the Schoolers amend their schedules and expressed concern about Tina Schooler serving as executrix of her father's probate estate.

> Mr. and Mrs. Schooler are required to amend their schedules to list all property to which Mrs. Schooler has become entitled as a result of her father's death. This includes not only those assets to which she became entitled under the probate estate but extends to property which may have passed to her outside of probate (bank accounts, insurance, etc.). Accordingly, please have your clients immediately amend their schedules . . . I also have some concern that Mrs. Schooler may not be the [b]est person to serve as Independent Executrix of her father's probate estate. This needs to be discussed at length to determine whether the creditors' interest can be adequately protected if she serves in that capacity.

*Id.*

The Trustee sent a similar letter to Mr. Westhoff on the same date, advising him of the bankruptcy estate's entitlement to one-half of Gremminger's estate under section 541(a)(5)(A) of the Bankruptcy Code and, in furtherance of such right, the debtors' obligation to amend their bankruptcy schedules. She told Mr. Westhoff of her position regarding any attempt by Tina Schooler to disclaim the inheritance. Finally, as in her letter to Mr. Calfin, she stated as follows: "Please contact me at your earliest convenience so that we can discuss this matter at length. I am concerned that Mrs. Schooler may not be the best person to serve as Executor since she will have direct control over bankruptcy estate assets and the timing of the activities in probate court." Plaintiff's Exhibit 26.

Mr. Westhoff responded to the Trustee the next day, December 5, 2001. *See* Defendant's Exhibit 12. He informed the Trustee that he did not represent the Schoolers in any individual capacity, but that it was his "belief" that "Mrs. Schooler did not inherit any assets, unless and until all debts and obligations of the Estate have first been discharged." *Id.* Despite asserting that he did not represent the Schoolers in any individual capacity, he offered his opinion that Tina

Schooler did have the right to disclaim her inheritance. *Id.*

A few days later, on December 11, 2001, bankruptcy counsel for the Schoolers sent a memo to the Trustee making somewhat nebulous claims:

> Here's the purpose of this memo. I would assume that Tina Schooler will be allowed to marshal the assets of the estate granting her the greatest possible exemptions. In other words, I would think she would be allowed to use the cash to pay the bills since the cash will be non-exempt assets and retain personal property that may be claimed as exempt property. If you have any case law or disagreement with this presumption, please let me know promptly. I plan on talking to the probate attorney in Fort Worth in the near future.

Defendant's Exhibit 2. The Schoolers were not conceding the Trustee's rights to the inherited assets.

On December 13, 2001, Mr. Nix issued a sharp response to bankruptcy counsel, stating that Tina Schooler's position that she could disclaim her interests was "ridiculous," that he (Mr. Nix) had "concerns about [Tina Schooler] serving as Executrix of this Estate . . . " and that the "real issue is whether or not [Tina Schooler] has spent any of the proceeds from her father's estate, even a dime." Plaintiff's Exhibit 28. The Trustee was provided with a copy of this letter.

In early February 2002, Nix received an unverified copy of the Schoolers' amended schedules A, B, and C. He addressed concerns he had regarding the schedules in a letter to Mr. Calfin dated February 11, 2002. *See* Plaintiff's Exhibit 29. In such letter, he stated it would be necessary to take a Rule 2004 examination to inquire about various gifts to Tina Schooler's son and her sister's son that were claimed under the amended schedules, and he questioned the authority for asserting that Ms. McWilliams could claim a life estate in certain real property from the Gremminger Estate. Then he stated, "I am very worried by the fact that Mrs. Schooler is in possession of over $50,000.00 of cash (including life insurance money). This money should

certainly be turned over to the Chapter 7 Trustee, and I will be asking the Trustee to make a

motion for such relief if Mrs. Schooler will not do so voluntarily." *Id.* The Trustee was provided

with a copy of this letter, as well.

### 4. Bankruptcy and Probate Filings; 2004 Exam of Tina Schooler – February 20, 2002 to March 15, 2002

The Schoolers amended their bankruptcy schedules on February 20, 2002. *See* Plaintiff's

Exhibit 16. The amended schedules reflect, under Schedule A – Real Property, the debtors'

undivided one-half interest in the homestead of Hank Gremminger located at 1205 S. Mill Street,

Weatherford, Parker County, Texas, with a value of $90,000.00. *Id.* On Schedule B – Personal

Property, the Schoolers disclose an undivided one-half interest in cash obtained from the estate of

Hank Gremminger, a total amount of $96,000.00, with the debtors' interest thereby valued at

$48,000.00. Schedule B further reflects an interest in household goods from the Gremminger

estate at $18,835.00 and a one-half interest in a life insurance policy on the life of Hank

Gremminger with a total value of $10,000.00, thereby making the debtors' interest $5,000.00.

The amended schedules also reflect an undivided one-half interest in one vehicle, a 1991 Isuzu

Rodeo valued at $250.00, and farm equipment from the estate of Hank Gremminger valued at

$4,744.00. The farm equipment valued at $4,744.00, the household goods valued at $18,835.00,

and the undivided one-half interest in life insurance valued at $5,000.00 are each listed as exempt

property under Schedule C – Property Claimed as Exempt. *Id.* Attached to the amended

schedules is an exhibit stating that a 22 Rifle and a 22-gauge shotgun were "gifted to" Sam

Schooler prior to the death of Hank Gremminger, that a 1961 chamionship ring was "gifted to"

Sam Schooler prior to the death of Hank Gremminger, that a 1965 championship ring was "gifted

to" Chase McWilliams prior to the death of Hank Gremminger, and that a 1991 Isuzu Rodeo was

"gifted to" Kim McWilliams. The exhibit further clarifies that Kim McWilliams, the daughter of

Hank Gremminger, claims the real property as homestead and asserts a life estate in the property.

Because of such claims, the Schoolers' interest in the undivided one-half is "significantly less

than $45,000.00." *Id.*

On February 28, 2002, Tina Schooler, acting as independent executrix of the estate of

Hank Gremminger, filed in the probate estate the Inventory, Appraisement and List of Claims.

*See* Plaintiff's Exhibit 3. The inventory listed total property valued at $252,606.97. This

included real property located at 1206 S. Mill Street, Weatherford, Texas, valued at $98,500.00,

household furnishings and fixtures of $19,310.00, a $54,242.58 certificate of deposit held at The

Bank in Weatherford, Texas, a money market account at the same bank with a value of

$42,000.00, a checking account at The Bank in the amount of $9,394.69, and a checking account

at First National Bank in the amount of $9,499.70. *Id.* It also included five vehicles ranging in

value from $10,750.00 for a 1999 Chevrolet pickup to $110.00 for a "Small box utility trailer."

*Id.*

Tina Schooler had her examination under Rule 2004 of the Federal Rules of Bankruptcy

Procedure taken on March 15, 2002. She was questioned by Graham Winegeart (representing

LNB), the Trustee, and her attorney, Mr. Calfin. *See* Plaintiff's Exhibit 15.

5. More Letters from LNB to Trustee – March 22, 2002 to January 5, 2005

Following the examination of Tina Schooler, on March 22, 2002, Nix sent a letter to the

Trustee setting forth LNB's concerns:

It is clear that Mrs. Schooler holds a one-half undivided interest in Mr.
Gremminger's home. You will recall that Mrs. Schooler and her attorney have
claimed that such interest is subject to a life estate held by Ms. McWilliams. I have
consulted a real estate attorney and a probate attorney, and they tell me that the only

- 9 -

ways that Ms. McWilliams could hold such an interest is if there is a writing granting that interest (deed, will, etc.) or, pursuant to section 284 of the Texas Probate Code, if Ms. McWilliams were Mr. Gremminger's surviving spouse or minor child. Based on Mrs. Schooler's testimony during the Rule 2004 examination, neither of the mentioned conditions have been met. In any case, we believe that you could sell the property in its entirety pursuant to 11 U.S.C. § 363(h).

Mrs. Schooler also stated that she is in possession of almost $100,000 and other probate estate property that is at least in part property of the bankruptcy estate. She has admitted that she is using the cash to maintain the home in anticipation of Ms. McWilliam's release from jail and return to the home. She also testified that she and her husband do not have substantial, regular income. *It must be awfully tempting for her to dip into that $100,000. If she were to do so, the bankruptcy estate would have no real recourse because she has not posted a bond.*

For these reasons, we believe that you must immediately take possession of the home, the cash, and the other property of the estate and begin reducing everything to cash. Should Mrs. Schooler not be willing to turnover this property or state that she must retain it as executor of Mr. Gremminger's estate, then we believe that you should make efforts to be appointed executor of Mr. Gremminger's estate pursuant to sections 541(a)(1) and 541(d) of the [B]ankruptcy [C]ode. *See* 5 *Collier on Bankruptcy* para. 541.11 (15th ed. rev. 1996).

Please give me a call at your earliest convenience so that we may discuss these matters.

Plaintiff's Exhibit 6 (emphasis added).

After the March 22, 2002 letter, LNB, through Mr. Nix, continued to make periodic requests for status reports from the Trustee, but the tone of such requests suggests an assumption that the Trustee had recovered the estate assets. On August 28, 2002, Nix sent a letter to the Trustee simply requesting a "status of the estate's efforts to liquidate the Debtor[s'] interest in the real and personal property which the Debtor inherited . . . ." Plaintiff's Exhibit 7. A similar request was made by letter dated January 20, 2003 from Nix to the Trustee. *See* Plaintiff's Exhibit 8. On February 26, 2003, Nix wrote the Trustee informing her that as trustee of the Schoolers' bankruptcy case she would be entitled to "additional assets in the Schooler

- 10 -

bankruptcy estate in the form of 'peanut base acreage.'" Plaintiff's Exhibit 9.  He also asked that she call him to provide a "status of the liquidation of the Gremminger Estate." *Id.*

After the Trustee filed with the Court the *Individual Estate Property Record and Report* for the period ending March 31, 2003, Nix sent a letter to the Trustee dated June 16, 2003, stating that given his review of the report, he wanted "to know . . . the status of the listing and sale of the real property coming out of the Estate of Hank Gremminger, Deceased."  Plaintiff's Exhibit 10. He also asked if the Trustee "had possession of the $48,000.00 in cash coming out of the same estate." *Id.*  He then requested an estimate of the time remaining until disbursements would begin. *Id.*

Less than a month prior to Nix's June 16 letter, in May 2003, an amended inventory of assets was filed by Tina Schooler in the Gremminger probate proceedings. *See* Plaintiff's Exhibit 4.  The amended inventory reflected total property of a value of $276,823.77. *Id.*  The increased value of the inventory from the prior inventory consisted of additional cash assets of approximately $25,000.00. *Id.*

After the May, 2003 letter, the inquiries were more sporadic.  Mr. Nix sent letters to the Trustee on July 29, 2003 and November 12, 2003, respectively. *See* Plaintiff's Exhibits 11, 12. Then, after reviewing the Trustee's *Individual Estate Property Record and Report* for the period ending March 31, 2004, Nix sent a letter to the Trustee asking again when disbursements would begin. *See* Plaintiff's Exhibit 13.  He also stated, "I understand that you have a heavy case load, but my client must insist that some action be taken in this case immediately." *Id.*  Finally, on January 5, 2005, Nix sent a letter to the Trustee requesting that she call him to discuss various matters within the letter, including information he provided regarding two NFL rings and other

personal property that belonged to Mr. Gremminger. *See* Plaintiff's Exhibit 14.

     6. The Trustee's "Response" and Administration

     Despite the numerous inquiries by Mr. Nix, and despite the tenor of such inquiries, the Trustee never provided a written response to Mr. Nix. Prior to March of 2005, she made no formal demand for turnover of the estate assets on Tina Schooler, her bankruptcy counsel, or Mr. Westhoff, the probate estate counsel. She took no action in the probate proceeding to have an alternate executor appointed and never pursued any action in the bankruptcy court to protect the bankruptcy estate's interest in the Gremminger estate.

     The Trustee did, on March 26, 2002, file a report with the Court stating that the case had changed from a no-asset case to an asset case. *See* Plaintiff's Exhibit 17. As stated, she also filed the *Individual Estate Property Record and Report* for the periods ending March 31, 2003 and March 31, 2004. She continued filing such reports for the periods for years 2005 - 2008. For the years 2003 and 2004, the reports reflect that the estate was still holding an undivided one-half interest in the "homestead" from the Gremminger estate, valued at $90,000.00, and cash from the Gremminger estate of $48,000.00. For the years 2005 through 2007, the half interest in the homestead was reduced to a value of $45,000.00. In the report for the period ending March 31, 2008, the homestead value was reduced to $4,151.28, with a notation that the "house is held by estate and is subject to life estate in Kim McWilliams; current value is for the remainder interest based on current life expectancy present value." Plaintiff's Exhibit 23. This notation contradicts the Trustee's position as reflected in a letter to debtors' counsel three years earlier, on March 7, 2005. This letter, dated more than three years after Gremminger's death, requested a full accounting of the Gremminger estate, demanded turnover of "all cash and properties to which Tina Schooler became entitled as a result of the death of Gremminger, including both probate

and non probate assets," and explained the Trustee's position opposing any homestead claim by Ms. McWilliams to the real property at 1206 S. Mill, Weatherford, Texas. *See* Plaintiff's Exhibit 27. In this regard, she stated as follows:

> It is my understanding that Kim McWilliams, the sister of Tina Schooler is claiming a "homestead right" in said property. As I understand it, Ms. McWilliams and her minor son were residing with Mr. Gremminger in the home from 1996 to 1998 at which time Ms. McWilliams became incarcerated. It has also been represented that Ms. McWilliam[s]'s son continued to reside in the home at 1206 S. Mill for approximately one year and that Ms. McWilliams at all times in question intended to return to the home upon her release from prison. Assuming these facts are all true, and that Ms. McWilliams did not abandon any homestead claim, I do not believe that Ms. McWilliams has the absolute right to continue to occupy the home.

> Two different rights are associated with homestead claims upon death. One arises out of Section 271 of the Texas Probate Code and has to do with property passing free and clear from debts of the decedent. Under Section 271, the mere existence of an unmarried child remaining with the family is sufficient to cause the homestead to descend free from the claims of creditors. Article 16, Section 52 of the Constitution addresses the other right associated with homestead property; the right to partition (restricted by the right to occupy). The homestead rights conferred by Article 16, Section 52 apply only to a spouse and minor children. While the existence of an unmarried adult child residing in the home will cause the home to descend free of debts, an unmarried adult child will not prevent a partition by heirs or devisees as an adult unmarried child is not one of the persons listed in Article 16, Section 52 entitled to claim a homestead after the death of the owner. Since Ms. Schooler's undivided interest in the home belongs to the bankruptcy estate, Ms. McWilliams cannot continue occupying the homestead over the bankruptcy estate's objection.

Plaintiff's Exhibit 27. The letter concludes with her claim that the two NFL championship rings belong to the Gremminger estate and thus should have been delivered to the Trustee, as well.

The annual reports were not accurate when filed as the Trustee never had either actual or constructive possession of the assets listed in the reports. She testified that such items and their values were taken from the debtors' schedules.

### 7. LNB's Motion and the Court's April 24, 2009 Order

Apart from possible phone conversations between the Trustee and debtors' counsel, the Trustee's March 7, 2005 letter to debtors' counsel represents the only affirmative action taken by the Trustee to recover the Gremminger estate assets. Unfortunately, the letter was too late. It was not until April 2009 that the Trustee confirmed Tina Schooler had indeed received her half interest in the Gremminger estate and, more important, had spent the entirety of the inheritance. This discovery was made after a hearing held on April 21, 2009, on a motion filed by LNB requesting that the Court direct the Trustee to perform her duties. The Court issued its order, entered April 24, 2009, finding that the Trustee had failed to perform certain duties designated to trustees under section 704 of the Bankruptcy Code and, specifically, directed that the Trustee file a written report with the Court by May 22, 2009, setting forth the status and disposition of all assets of the Gremminger estate. *See* Plaintiff's Exhibit 36. In furtherance of the Trustee's obligation to prepare and file such report, the Court also directed the Trustee to take the examinations of Tina Marie Schooler and John Westhoff, attorney for the Gremminger estate.

### 8. The Trustee's Report and Suit Against Tina Schooler

After conducting the examinations, the Trustee filed the report that confirmed the loss of the Gremminger estate assets. *See* Plaintiff's Exhibit 37. The real property held by the probate estate, the home at 1206 S. Mill Street, Weatherford, Texas, sold September 23, 2004 for the sum of $100,000.00, netting the probate estate $89,003.85. Schooler received half of the net proceeds, which were placed in her bank account and spent for "household bills/living expenses." *Id.* The household goods and furnishings held by the Gremminger estate, originally listed at a value of $18,735.00, were, according to Tina Schooler's testimony, discovered missing from

their location at the house in September of 2002. These items were never recovered. Cash and cash equivalents inherited by Tina Schooler, including a C.D. valued at $53,564.68, a money market account of $81,629.96, a checking account of a value of $3,205.13, and other cash and coins of a value of $900.00, were all disbursed to Tina Schooler. *Id.* Tina Schooler testified that her share was deposited into her personal bank accounts and was used for "household bills and to live on." *Id.* Various other items of personal property were listed, including the two NFL championship rings, about which Tina Schooler testified had been given to Sam Schooler and Chase McWilliams, respectively. Apart from the house, which accounts for approximately $45,000.00 of Tina Schooler's inheritance from the Gremminger estate, Tina Schooler received a total of $67,959.45, consisting of a few items of personal property and her half of the cash disbursements.

Finally, the Trustee filed a lawsuit against Tina Schooler immediately before the April 21, 2009 hearing on LNB's motion. This lawsuit resulted in a settlement between the Trustee and Tina Schooler. It is anticipated that the estate will net $30,000.00 from this settlement, which must be paid by December 31, 2010.

### Discussion

1. Contentions of the Parties

By bringing this action against Liberty Mutual, LNB submits that Liberty Mutual, as surety under the Trustee's blanket bond, is directly liable to it and, as a result, judgment should issue in LNB's favor in the amount of $112,247.66, plus attorneys' fees and costs. Liberty Mutual's liability is triggered because, according to LNB, the Trustee is obligated as the principal under the bond for her failure to "faithfully perform" her duties as trustee. LNB submits that the

Court's order of April 24, 2009, wherein the Court determined the Trustee had failed to perform her duties as trustee, collaterally estops Liberty Mutual from contesting its liability. Alternatively, LNB contends that if gross negligence is the standard for imposing liability on the Trustee and thus Liberty Mutual, the Trustee's failure to perform her duties satisfies a gross negligence standard.

Liberty Mutual submits that LNB's claims are barred by limitations; and if not, Liberty Mutual's liability is contingent upon a finding that the Trustee was grossly negligent. Liberty Mutual contends that the Trustee's conduct, taken as a whole, does not support a finding of gross negligence; and even if some of the Trustee's conduct was grossly negligent, no damages resulted from such conduct. Liberty Mutual disputes that, under any circumstance, LNB is entitled to attorneys' fees.

2. <u>Threshold Issues: Collateral Estoppel and Limitations</u>

The merits of LNB's claim turn on whether the Trustee's conduct triggers Liberty Mutual's liability under the bond. Before reaching this issue, however, the Court first addresses both the collateral estoppel argument raised by LNB and the limitations defense raised by Liberty Mutual; either of these claims, if successful, essentially resolves the case without having to delve into the Trustee's conduct. First, the collateral estoppel issue is easily disposed of. The Court in its April 24, 2009 order simply set forth the Court's conclusions that the Trustee had failed to perform certain of her statutory duties. The Court did not, however, decide whether the Trustee's failures rose to the level of intentional neglect, gross negligence, or even simple negligence.

- 16 -

Collateral estoppel is not applicable in light of the issues presently before the Court.[2]

The limitations question is more complicated. Section 322(d) of the Bankruptcy Code states that "[a] proceeding on a trustee's bond may not be commenced after two years after the date on which such trustee was discharged." Liberty Mutual argues, in effect, that the language of section 322 merely sets an outer limit of limitations and that a state law limitations period may apply and thus result in a shorter limitations period. Thus, the Texas two year statute of limitations under the Texas Civil Practice and Remedies Code applies to bar LNB's claim, according to Liberty Mutual. The Texas statute presumably applies in cases involving negligence or gross negligence. Liberty Mutual submits that as surety, it may rely upon any defense available to the Trustee, the principal under the bond, in a hypothetical action lodged against the Trustee. As its liability can only arise from the Trustee's gross negligence, Liberty Mutual argues that it can also take advantage of the Trustee's defense of limitations under the Texas statute. The action here would therefore be barred as the timing of the legal injury, the loss to the bankruptcy estate, occurred prior to 2005, by which time Tina Schooler had already spent the inheritance and her misappropriation rendered uncollectible. The basic question is whether section 322 of the Bankruptcy Code preempts state law limitations. Stated otherwise, does it "supplant" or merely "supplement" the shorter state law limitations period? *See Oles Grain Co.*

---

[2]During the trial of this case, the Court took under advisement the question of whether the transcript of the proceedings held on April 23, 2009 should be admitted upon LNB's request in support of its claim of collateral estoppel (the Court's April 24, 2009 order was issued from the hearing). Liberty Mutual objected to admission of the transcript as Liberty Mutual was not a party to such proceeding. As the Court holds that collateral estoppel does not apply, it is not necessary to consider the transcript. The Court will, however, for the record, overrule the objection and hereby admit the transcript. *See Grogan v. Garner*, 498 U.S. 279, 281 (1991) (Supreme Court reviewed bankruptcy court's application of collateral estoppel proven through the admission of a portion of prior court record).

*v. Safeco Ins. Co. of Am.*, 221 B.R. 371 (N.D. Tex. 1998).[3] Liberty Mutual's position that section 322 merely supplements the state law of limitations is not without support in the law. The courts are divided on this question. *See* 3 COLLIER ON BANKRUPTCY ¶ 322.05 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.); *compare Oles Grain*, 221 B.R. at 374, *with In re Louis Rosenberg Auto*, 209 B.R. 668 (Bankr. W.D. Pa. 1997).

Despite the split of authority on this question, the matter is resolved in the Northern District of Texas by *Oles Grain*. The district court in *Oles Grain* thoroughly addressed the arguments applicable to the issue, including arguments similar to the ones made here by Liberty Mutual, and concluded "that Congress intended to create a statute of limitations for actions on a bankruptcy trustee's bond that was to be the statute of limitations for such actions." *Oles Grain*, 221 B.R. at 375. The court found no indication that the two year limitation as referenced in section 322(d) was intended to set an outer limit for limitations purposes, under which a state statute could supply a shorter statute of limitations. Section 322(d) was therefore held controlling. *Id.*

Notably, the district court also considered whether, under state law, a surety was exonerated when the limitations period had run on a hypothetical action directly against the

---

[3]The Court questions the applicability of state law, in this case Texas law. This case concerns the liability of a bonding company under a bond that is issued pursuant to section 322 of the Bankruptcy Code "in favor of the United States." As a condition to serving as a case trustee in a bankruptcy case, the appointed trustee is required to obtain such a bond. The United States trustee selects the trustee and determines the amount and sufficiency of the bond. The Bankruptcy Code allows a "trustee in a case under this title . . . to sue and be sued." 11 U.S.C. § 323. And, as discussed above, the Code provides that an action on the bond may not be commenced after two years after the date on which such trustee was discharged. § 322(d). This is a decidedly federal case.

The District court in *Oles Grain* likewise raised the question of whether state law was properly invoked. On the question of whether the surety was exonerated because an action directly against the principal would not be timely under state law, the court said that the issue could conceivably be disposed of on congressional intent grounds and noted further that state laws are preempted to the extent they "stand as an obstacle to the . . . full purposes and objectives of Congress." *Oles Grain*, 221 B.R. at 376 n.7. In the same vein, the court stated that it "wonders whether federal common law should be developed in this area." *Id.* at 376 n.8.

principal. *Id.* at 376. In construing Texas law, the district court concluded that the Texas

Supreme Court would not adopt a strict rule that exonerated the surety if limitations had run

against the principal. The court's analysis included a review of the Texas Supreme Court case

cited by Liberty Mutual, *Great American Insurance Co. v. North Austin Municipal Utility*

*District No. 1*, 908 S.W.2d 415 (Tex. 1995). Liberty Mutual submits that *Great American*

undermines the holding of *Oles Grain* and makes it "clearly incorrect." Despite Liberty Mutual's

construction of *Great American*, the Court disagrees with such a construction and agrees with the

reasoning of *Oles Grain* and, most important, is bound by the decision of *Oles Grain. See In re*

*Rand Energy Co.*, 259 B.R. 274, 276 (Bankr. N.D. Tex. 2001) (Felsenthal, J.); *see also In re*

*Jobs.com, Inc.*, 283 B.R. 209, 218 (Bankr. N.D. Tex. 2002) (stating that "decisions from a United

States District Court in this District on appeal are binding precedent on bankruptcy courts in this

District.") (Houser, J.). Section 322(d) sets the limitations period for this action against Liberty

Mutual. This action is not barred by limitations.

    3. The Standard of Care in Assessing Bonding Company's Liability

       (a) Gross negligence standard for trustee's conduct

As neither LNB's offensive use of collateral estoppel nor Liberty Mutual's defense of

limitations are applicable, the Court now addresses the substantive legal issue before it: Is

Liberty Mutual liable under the blanket bond in light of the Trustee's failures in fulfilling her

duties as the chapter 7 Trustee? The Fifth Circuit in *In re Smyth*, 207 F.3d 758 (5th Cir. 2000),

held that the gross negligence standard applies when assessing whether trustees should be held

personally liable for their conduct. *Id.* at 762. In addition, the Fifth Circuit in *In re Texas Pig*

*Stands, Inc.*, 610 F.3d 937 (5th Cir. 2010), which draws a distinction between the trustee's

personal liability to a third party (a taxing authority for failure to pay taxes) and the trustee's personal liability to the bankruptcy estate, specifically noted that the *Smyth* case stands for the proposition "[t]hat a trustee is only liable to the bankruptcy estate for acts of gross negligence." *Id.* at 3. The gross negligence standard is "the standard of care by a trustee to the estate when the trustee acts as its agent." *Id.*

> (b) Imputing trustee's standard of care to bonding company; question of trustee's liability in "official" capacity as opposed to liability personally

Both *Smyth* and *Pig Stands* address the liability of a *trustee*; the liability of a bonding company was not at issue in either case. The Court considers whether the analysis is altered given that the claim here is made exclusively against the bonding company, Liberty Mutual. For example, can a trustee's *negligent* conduct result in the bonding company's liability? In this regard, the leading treatise on bankruptcy law, Collier on Bankruptcy, states without qualification, "When a trustee negligently performs the trustee's duties, liability under the bond is activated." 3 COLLIER ON BANKRUPTCY ¶ 322.02[2] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.) (citing *In re Reich*, 54 B.R. 995, 1008 (Bankr. E.D. Mich. 1985)). The case cited by Collier, the *Reich* case, addressed at length the confusion that had by then arisen under the law in determining the liability of a bankruptcy trustee. *Id.* The confusion arises from the distinction some courts have drawn between a bankruptcy trustee's liability in his "official" or professional capacity and his liability personally. This is evident from the court's statement as follows:

> A trustee who fails to exercise due diligence to conserve assets of the bankruptcy estate must account for assets dissipated through his negligence. *Carson, Pirie, Scott & Co. V. Turner*, 61 F.2d 693 (6th Cir. 1932). The measure of care, diligence and skill required of a bankruptcy trustee is that of an ordinarily prudent man in the

> conduct of his private affairs under similar circumstances and of a similar object in view; and although a mistake of judgment is not a basis to impose liability on a trustee, a failure to meet the standard of care does subject him to liability. However, "a bankruptcy trustee is liable personally only for acts willfully and deliberately in violation of his fiduciary duties." *Ford Motor Credit Co. v. Weaver*, 680 F.2d 451, 461 (6th Cir.1982).

*In re Reich*, 54 B.R. at 998. The effect of the distinction, at least in the Sixth Circuit, is that a trustee is liable in his "official" capacity for mere negligence, but he is personally liable for a willful and deliberate violation of his duties. In the first instance, the trustee could be "surcharged" for negligence, meaning a claim is made against the trustee's "official account" to cover his negligence.[4] The Court assumes this would be the trustee's right to a commission as a result of his services provided in the case. The court in *Reich* was critical of the analysis that drew such distinction, though it recognized it was obligated to follow the Sixth Circuit's holdings on the issue. In light of the facts and circumstances before it, the court in *Reich* stated as follows:

> If the trustee was "merely" negligent, he is liable only in his "official" capacity, whatever that may be; however, if he willfully breached his duty, he is personally liable for any loss. Since the plaintiffs have consistently alleged that the defendant's breach of his fiduciary duty to preserve estate assets was negligent and not intentional, the defendant is liable, if at all, only in his official capacity.

*Id.* at 1002. The court in *Reich* found that the bonding company was liable to the chapter 7 debtors, the plaintiffs there, where the trustee had negligently failed to remove snow from the roof of a building which collapsed from the weight of the snow. The trustee had also failed to insure the building. The court concluded that the trustee had failed to faithfully perform his duties and therefore imposed liability on the bonding company.

---

[4]The Court uses the term "surcharge" differently than how it has been interpreted to have been used by the Supreme Court in *Mosser v. Darrow*, 341 U.S. 267 (1951). The Supreme Court's opinion in *Mosser v. Darrow* is the starting point for many courts, academics, and commentators when addressing trustee liability. In *Mosser*, the Supreme Court equated surcharging a trustee with imposing personal liability on a trustee. *See In re Reich*, 54 B.R. at 998-99.

(c) Applicability of gross negligence standard in assessing bonding company's liability

Accordingly, the Court considers whether Liberty Mutual's liability under the bond can be triggered by the Trustee's simple negligence rather than gross negligence on the theory that the surety must answer for either or both of the Trustee's "official" liability or personal liability. In this regard, the Court is satisfied that, regardless whether two types of liability are recognized, the gross negligence standard applies here. The gist of LNB's claim is that the Trustee failed to recover assets for the bankruptcy estate. The Fifth Circuit in *Pig Stands* noted that its prior decision in *Smyth*, which sets forth the gross negligence standard, addressed the standard of care owed by a trustee to the estate when he acts as its agent and held that a trustee is "only liable to the estate for acts of gross negligence." *Pig Stands*, 610 F.3d at 943. The *Smyth* court, in adopting a gross negligence standard, looked to the Final Report of the National Bankruptcy Review Committee, describing the state of the law on the issue of the trustee's standard of care as a "crazy quilt" of decisions. *Smyth*, 207 F.3d at 761. Noting the conflicting policy considerations – that too little protection might expose a trustee to excessive personal liability and dissuade capable people from becoming trustees, while too much protection would jeopardize the goal of responsible estate management – the committee recommended the adoption of the gross negligence standard for chapter 7, 12, and 13 trustees. *Id.* at 761-762.

The Court mentions the policy considerations for the gross negligence standard as it could be argued here that the concept of official liability does not severely undermine the policy of protecting trustees as the trustee's exposure would be limited to the extent of the trustee's pecuniary interest in the case (i.e., the trustee's right to a commission). The problem with this argument, however, is that the trustee presumably indemnifies the bonding company and would

thus be subjected personally to the bonding company for whatever amounts the bonding company would have to pay over to the estate to cover the trustee's official liability. *See In re Reich*, 54 B.R. at 1009.

As the parties are aware, the Court has already decided in its memorandum opinion of May 12, 2010 on the motion for summary judgment filed by LNB, that Liberty Mutual's liability must be triggered by the gross negligence of the Trustee. This conclusion was reached after reviewing the language of the bond along with the Fifth Circuit's holding in the *Smyth* case.

> The language of the bond – "faithful performance of [the trustee's] official duties" – is, as it states, lifted directly from section 322(a) of the Bankruptcy Code. While LNB argues that this standard triggers liability of the bonding company, and is thus distinguished from the Trustee's personal liability, the Court notes that, if such language determines the bonding company's liability, it also determines the Trustee's liability. The obligation under the bond applies to both the principal and the surety, the Trustee and Liberty Mutual. The language cannot be parsed in a way that reconciles the bond with the gross negligence standard unless the gross negligence standard informs the meaning of "faithful" performance. . . . Under Texas law, "[u]nless a cause of action exists against the principal, it cannot exist against the surety." *Great Am. Ins. v. Austin Utility*, 908 S.W.2d 415, 419 (Tex. 1995) (citing *Girard Fire & Marine Ins. Co. v. Koenigsberg*, 65 S.W.2d 783, 786 (Tex. Civ. App.—Dallas 1933, no writ). The language of the bond determines and may limit the liability of the surety; however, an action cannot be pursued against the surety unless the principal is also liable on the action. *Id.*; *Geters v. Eagle Ins. Co.*, 834 S.W.2d 49, 50 (Tex. 1992). In other words, "the liability of the surety depends on the contract *and* the existence of facts showing liability on the part of the [principal]." *Colonial Am. Cas. & Surety Co. v. Scherrer*, 214 S.W.3d 725, 730 (Tex. App.—Austin 2007, no pet.) (emphasis added).

*In re Schooler*, No. 01-51003, 09-05011, 2010 WL 1946268, at *3 (Bankr. N.D. Tex. May 13, 2010). The Court reiterates its prior holding that unless the Trustee was grossly negligent, Liberty Mutual is not obligated under the bond.

(d) The bankruptcy court's determination of gross negligence without expert testimony

The Court now addresses the Trustee's conduct (or lack of action) to determine if it meets

a gross negligence standard. Liberty Mutual contends the Court cannot make this determination without expert testimony on the standard of care. "Without proof of what a diligent and competent bankruptcy trustee would do under similar circumstances, there can be no basis for a conclusion that [the Trustee] deviated from [the standard of care] by intentionally failing to perform a manifest duty in reckless disregard of the consequences." Liberty Mutual's Post-Trial Brief at 2. Liberty Mutual suggests that the Court is serving as a witness or improperly invoking judicial notice if it determines the Trustee's standard of care.

The Court disagrees with Liberty Mutual. First, the Court recognizes that there is some confusion in the law on whether a trial judge may determine the standard of care in a professional malpractice case. Some courts hold that the judge in a bench trial cannot make this determination. *See Royal Ins. Co. of America v. Miles & Stockbridge, P.C.*, 138 F. Supp. 2d 695, 700 (D. Md. 2001) (stating that "[a] trial judge does not . . . determine the standard of care in a legal malpractice case, even though it is an area in which a court arguably has unique expertise"); *see also Lentino v. Fringe Emp. Plans, Inc.*, 611 F.2d 474 (3rd Cir. 1979) (finding expert testimony should be required in bench trials even though the trial judge may be familiar with the relevant standard of care). Other courts have held that the judge may substitute his experience and knowledge for that of an expert witness in determining whether a professional standard of care was met and if the breach caused damages to the plaintiff. *See U.S. Fidelity & Guar. Co. v. E.L. Habetz Builders, Inc.*, No. 06-895, 2008 WL 850431, at *15 (W.D. La. Mar. 28, 2008) (following Louisiana law); *see also In Re Monahan Ford Corp. of Flushing*, 390 B.R. 493, 504 (Bankr. E.D. N.Y. 2008) (finding that the bankruptcy court was inherently qualified to judge the professional competence of debtor's counsel without expert assistance); *see also In re Precept*

- 24 -

*Bus. Servs., Inc.*, No. 01-31351-SAF-7, 2004 WL 2074169, at *10 (Bankr. N.D. Tex. Aug. 23,

2004) (Felsenthal, J.) (stating that the court could decide whether an attorney made a reasonably

prudent decision without an expert's opinion); *In re Fabbro*, 411 B.R. 407, 425 n.54 (Bankr. D.

Utah 2009) (stating expert testimony was not required to determine if realtor breached duty to

debtor as realtor's duties were within knowledge of a layperson); *In re Rollins*, 175 B.R. 69

(Bankr. E.D. Cal. 1994) (permitting court to evaluate conduct of trustee without expert

testimony).

 The bankruptcy court in *Monahan Ford* addressed whether, in a bench trial, expert

testimony was necessary to determine if the debtor's counsel was negligent.[5]  *In re Monahan*

*Ford*, 390 B.R. at 504.  Counsel argued that the court must deny the trustee's motion for

summary judgment brought against the debtor's counsel on legal malpractice grounds because

the trustee failed to present expert testimony or an expert's affidavit concerning the applicable

standard of care for the attorney.  *Id*.  While expert testimony or affidavits are typically used to

prove legal malpractice, the bankruptcy court determined that because it is charged under the

Code to review a debtor's transactions with the debtor's attorneys in determining compensation,

the bankruptcy court could, without the assistance of expert testimony, evaluate the competence

of attorneys representing the debtor.  *Id*.

 The court reached its conclusion by looking to two of the factors that the court must

consider under section 330 in evaluating compensation of counsel for the debtor-in-possession:

"(1) 'whether the professional has demonstrated skill and experience in the bankruptcy field';

---

[5]The Court's reference to "debtor's counsel" in discussing *Monahan* means the same as counsel for the "debtor-in-possession."

and (2) 'whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners' in non-bankruptcy cases." *Id.* at 503-04. The court emphasized that its evaluation of the reasonableness of attorney's fees under section 330 "necessarily involves an assessment of the professional competence and skill with which the services were performed." *Id.* The court reasoned that given its statutory duties under sections 329 and 330, as well as its routine observation and evaluation of professionals in bankruptcy cases, it was better situated than any "expert" to evaluate the conduct of debtor's counsel. *Id.*

In Texas, expert testimony is required to establish negligence "when the alleged negligence is of such a nature as not to be within the experience of [a] layman." *3D/I + Perspectiva. v. Castner Palms, Ltd.*, 310 S.W.3d 27 (Tex. App.—El Paso 2010, no pet.) (citing *FFE Transp. Servs., Inc. v. Fulgham*, 154 S.W.3d 84, 90 (Tex. 2004)); *see also Simmons v. Briggs Equip. Trust*, 221 S.W.3d 109, 114 (Tex. App.—Houston [1st Dist.] 2006, no pet.). In simple negligence cases, a plaintiff must establish "1) a legal duty owed by one person to another, 2) a breach of that duty, and 3) damages proximately resulting from the breach." *Marin v. Gilberg*, No.V-07-62, 2009 WL 699947, at *2 (S.D. Tex. Mar. 11, 2009) (citing *Critchfield v. Smith*, 151 S.W.3d 225, 230 (Tex. App.—Tyler 2004, pet. denied)). In cases of professional negligence the same essential elements of negligence must still be met, but duty and breach are defined by the community of professionals to which the defendant belongs. *Id.* For example, in legal malpractice cases a breach of the applicable standard of care and causation linking the breach to damages suffered by the plaintiff must be established by expert testimony of the standard of care applicable to the community of lawyers in which the defendant practices. *Cantu v. Horany*, 195 S.W.3d 867, 873 (Tex. App.—Dallas 2006, no pet.); *see also Floyd v. Hefner*,

556 F. Supp. 2d 617, 643 (S.D. Tex. 2008). Breach of the standard of care and causation are two separate elements that must be established through expert testimony in order to provide the trier of fact with an understanding for the causal link between the defendant's actions and the plaintiff's harm. *Alexander v. Turtur & Assocs., Inc.*, 146 S.W.3d 113, 119 (Tex. 2004).

Texas courts, however, generally do not require expert testimony to prove a breach of the standard of care or a causal link to damages from the breach if the actions were so obvious and egregious to be within the knowledge and experience of a layperson. *See F.W. Indus., Inc. v. McKeehan*, 198 S.W.3d 217, 221 (Tex. App.—Eastland 2005, no pet.); *see also Alexander*, 146 S.W.3d at 120. The most common example of such an action is an attorney who let the statute of limitations run on a client's cause of action. Such a breach of the standard of care is considered to be so obvious as to be within a layperson's understanding and, thus, no expert testimony is required. If the actions or the causal link reach beyond the common understanding of a layperson, expert testimony is required. *Alexander*, 146 S.W.3d at 120; *F.W. Indus.*, 198 S.W.3d at 221 (finding that expert testimony was required because the effect of a bankruptcy filing was not within a layperson's common knowledge). If the action subject to the suit involved a tactical or technical decision by the professional, it is usually deemed beyond the understanding of a common person, and thus expert testimony is required. *Id.*

Upon considering the state of the law as set forth in the foregoing discussion, the Court is satisfied and concludes that given the particular facts and circumstances present here, the Court can, without the help of expert testimony, assess whether the Trustee's conduct constitutes gross negligence. Whether the Trustee should have done *something* affirmative, given the warnings she received and concerns expressed by LNB's counsel, requires no technical or expert

knowledge. By doing nothing, the Trustee ignored basic human nature. She had to realize that

the Schoolers, having filed bankruptcy because of financial difficulties, were tempted to use the

inherited funds, especially when apparently no one impressed upon them the requirement to turn

over the inheritance or explained to them the consequences of failing to do so. Their use of the

funds was especially predictable given the time that elapsed before any affirmative action was

taken. Any trustee in a similar situation would conclude that action needed to be taken.

In a case involving similar circumstances, the bankruptcy court in *In re Rollins* found that

the trustee's decision to wait four months from the section 341 meeting to act upon an

inheritance left to the debtor constituted a breach of the trustee's duty to secure assets of the

estate. *In re Rollins*, 175 B.R. 69, 74-76 (Bankr. E.D. Cal. 1994). In *Rollins*, the debtor listed an

inheritance from her grandfather on her schedules and also informed the trustee of it during the

first meeting of creditors. *Id.* At the 341 meeting, the debtor informed the trustee she would get

the trustee more specific information regarding the probate proceeding soon after the meeting,

but the debtor failed to turn over any information to the trustee. *Id.* at 72. After four months

passed, the trustee began investigating the situation and learned the debtor had already received

the inheritance. *Id.* at 72-73. The court determined that the trustee's failure to act within a week

or two after not receiving the requested information from the debtor constituted negligence. *Id.*

The court noted that the trustee should know that "some debtors are undependable or dishonest

or both," and the fact that the inheritance the debtor was to receive was entirely cash should have

led the trustee to the conclusion that he needed to act independently and quickly after the 341

meeting to ensure the estate recovered the inheritance. *Id.* at 74-75. The court in *Rollins* found

the trustee negligent for waiting four months; here the Trustee failed to act for eight years. A layperson can certainly determine whether the Trustee should have acted.

In addition, the Court agrees with the court in *Monahan Ford*, discussed above. Bankruptcy courts routinely assess the quality of a trustee's work when considering their requested compensation. The bankruptcy court is charged with the responsibility of determining whether a trustee's services, for work as a professional in the case, were necessary and thereby provided a material benefit to the estate; and assuming the threshold of necessity is met, the court determines the amount of reasonable compensation to be awarded. *See* 11 U.S.C. § 330(a); *see also Kaye v. Hughes & Luce*, No. 3:06-CV-01863-B, 2007 WL 2059724, at *9 (N.D. Tex. July 13, 2007). Among the factors to be considered by the court in making this latter assessment are whether the services were necessary or beneficial at the time they were provided; whether they were performed within a reasonable amount of time given the complexity, importance, and nature of the problem, issue, or task addressed; whether, with respect to a professional person, the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and whether the compensation is reasonable as compared with comparably skilled practitioners. *See* 11 U.S.C. § 330(a)(3).

4. Duties of the Trustee and the Definition of Gross Negligence

"A bankruptcy trustee is charged with the duty to 'collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of parties in interest.'" *In re Smyth*, 207 F.3d at 761 (citing 11 U.S.C. § 704(a)(1)). To be personally accountable to the estate for failing to perform this express

statutory duty, the trustee's failure must constitute gross negligence. *See id.*; *see also In re Texas Pig Stands, Inc.*, 610 F.3d at 943.

The Fifth Circuit, in *Smyth*, identified the following definition of gross negligence:

> The intentional failure to perform a manifest duty in reckless disregard of the consequences . . . . It is an act or omission respecting legal duty of an aggravated character as distinguished from a mere failure to exercise ordinary care. It amounts to indifference to present legal duty and to utter forgetfulness of legal obligations so far as other persons may be affected. Black's Law Dictionary at 1033 (6th ed.1990).

*In re Smyth*, 207 F.3d at 762. "This standard of care strikes the proper balance between the difficulties of the task assumed by trustees and the need to protect the interest of creditors and other parties in the bankruptcy case." *Id.* (citing *J.F.D. Enterprises*, 223 B.R. 610, 628 (Bankr. D. Mass. 1998)).

The most recent edition of Black's Law Dictionary defines gross negligence as "[a] lack of slight diligence or care" or "[a] conscious, voluntary act or omission in reckless disregard of a legal duty and of the consequences to another party . . . ." BLACK'S LAW DICTIONARY (8th ed. 2004). Additionally, it states:

> Negligence is gross if the precautions to be taken against harm are very simple, such as persons who are but poorly endowed with physical and mental capacities can easily take.
>
> *Gross Negligence.* As it originally appeared, this was very great negligence, or the want of even slight or scant care. It has been described as a failure to exercise even that care which a careless person would use. Several courts, however, dissatisfied with a term so nebulous . . . have construed gross negligence as requiring willful, wanton, or reckless misconduct, or such utter lack of all care as will be evidence thereof . . . . But it is still true that most courts consider that "gross negligence" falls short of a reckless disregard of the consequences, and differs from ordinary negligence only in degree, and not in kind.

*Id.*(citing H.L.A. Hart, "Negligence, *Mens Rea* and Criminal Responsibility," in *Punishment and Responsibility* 136, 149 (1968), and W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 34, at 211–12 (5th ed. 1984)).  As seen with the two standards above, gross negligence is an imprecise and ill-defined legal concept, with standards varying among jurisdictions.  Several bankruptcy courts have adopted the gross negligence standard in determining liability of a trustee for the trustee's failure to perform their duties, but fail to apply a uniform standard for gross negligence.  *Compare In re Smyth*, 207 F.3d at 762 (adopting the Black's Law Dictionary definition for gross negligence) *and In re J.F.D. Enters., Inc.*, 223 B.R. 610, 628 (Bankr. D.Mass. 1998) (referencing the Black's Law Dictionary definition for gross negligence) *with In re Cont'l Coin Corp.*, 380 B.R. 1, 14 (Bankr. C.D. Cal. 2007) (defining gross negligence as reckless indifference or deliberate disregard of a trustee's fiduciary duty).

Under Texas law, gross negligence is "the breach of a duty involving an extreme degree of risk, considering the probability and magnitude of the potential harm to others, when the actor has actual awareness of the risk involved but nevertheless proceeds in conscious indifference to the rights, safety, or welfare of others." *Gen. Motors Corp. v. Sanchez*, 997 S.W.2d 584, 595 (Tex. 1999); *see also Lane v. Halliburton*, 529 F.3d 548, 565 (5th Cir. 2008) (stating gross negligence is a heightened form of negligence).  This standard consists of both objective and subjective components; viewed objectively from the actor's position, the act or omission must involve the required degree of risk, and the actor must subjectively have actual awareness of this risk. *Id.*; *see also First Assembly of God v. Tex. Utils.*, 52 S.W.3d 482, 494 (Tex. App.—Dallas 2001, no pet).  The extreme risk required entails the likelihood of serious injury to others; serious injury is more than a slight possibility of injury or a high probability of minor harm. *Mobil Oil*

*Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex. 1998). Gross negligence requires more than

thoughtless or careless behavior, or inadvertence; acts that are "unjustifiable and likely to cause

serious harm" rise to the level of gross negligence. *First Assembly of God*, 52 S.W.3d at 494.

Acts demonstrating a "want of care as to establish that the act or omission was the result of actual

conscious indifference to the rights" of others constitute gross negligence. *Id.* In other words,

the defendant knew of the risk, but its acts or omissions demonstrated it did not care. *Mobile Oil*,

968 S.W.2d at 921.

### 5. The Trustee's Conduct and Whether it Satisfies the Gross Negligence Standard

As set forth in the statement of facts, the Trustee never provided a written response to Mr.

Nix's inquiries and prior to March 2005, made no formal demand of Tina Schooler or her

counsel, or to Mr. Westhoff, the probate estate counsel, that Tina Schooler's share of the estate

be turned over to her. She also took no action in the probate proceeding to have an alternate

executor appointed and never pursued any action in the bankruptcy court to recover the

Gremminger estate assets to which Schooler was entitled. Liberty Mutual argues that the Trustee

was justified in relying upon the Schoolers to do the right thing and that, by the time the Trustee

should have become concerned, the assets were already gone. In other words, the Trustee's

failure to aggressively pursue the probate estate assets for approximately the first two years after

Gremminger's death was reasonable in light of the normal delays and complications associated

with a probate estate. As a corollary to this, Liberty Mutual argues that the Trustee's failure to

act for the several years after Tina Schooler spent the inheritance is irrelevant on the issue of the

Trustee's gross negligence. The Court disagrees. First, while the Trustee may have been

- 32 -

justified in waiting a short period of time, her failure to take steps to ensure recovery of the

inheritance must be considered in light of the foregoing facts:

- The Schoolers' bankruptcy case was filed initially as a no-asset case and two months later was followed by Gremminger's death, which latter event signaled the possible recovery of substantial assets for the bankruptcy estate.

- Despite the Schoolers' intransigence in accounting to the Trustee and to the bankruptcy estate for the Gremminger inheritance, Tina Schooler moved immediately – six days after Gremminger's death – to admit Gremminger's will to probate.

- The many letters received by the Trustee from LNB's counsel, the tone of which reflects a genuine and justified concern on LNB's part that the Schoolers would not honor their obligation to account for Tina Schooler's inheritance and that the Trustee was not actively pursuing recovery of the inheritance.

- The failure of the Schoolers, including their counsel and probate counsel, to ever acknowledge an obligation to turn over the probate estate assets to the Trustee; and their assertion of novel legal theories to justify their failure to account for the inheritance.

- The Trustee's appreciation, as early as December 2001, that Tina Schooler was not the best person to serve as executor of the Gremminger estate and that she (the Trustee) should perhaps move to have Schooler replaced as executor of the Gremminger estate.

The Court does not understand why the Trustee, administering a no-asset bankruptcy

case, did not immediately pursue a windfall of significant assets. The Trustee is a lawyer who

testified that her expertise, in addition to bankruptcy law, includes probate and collections work.

It is painfully obvious that the Trustee should have taken affirmative steps early on in the

bankruptcy case to ensure the recovery of the probate estate assets. The Court is satisfied that,

for example, the Trustee could have intervened in the probate proceeding to protect her rights as

successor to Tina Schooler; or she could have moved before this Court. Indeed, she did take

action by filing suit against Tina Schooler – but not until April 2009 – once she realized her failures to act were being seriously questioned.

The Court rejects the Trustee's contention that she made a conscious decision not to take action, instead relying upon the debtors and their counsel to voluntarily turnover the estate assets. There are two problems with this explanation. First, the Trustee was confronted with several indications that the Schoolers did not intend to turn over the estate assets: Tina Schooler asserted a potential right to disclaim the inheritance; it was claimed that the residence may be subject of a homestead claim in favor of Kim McWilliams; the Schoolers' counsel told the Trustee that certain inherited funds were being used in support of the Schoolers' exemption claims. Second, the Trustee's conduct throughout the history of this case – her failure to respond to the numerous requests for status reports, her filing of incorrect inventories, and, ultimately, her failure to take definitive and affirmative action until specifically directed to do so by the Court – defies her explanation. At best, it reflects her indifference to her duties.

The Court does not characterize the Trustee's conduct as an intentional or willful failure. Her failure to act does, however, amount to more than mere failure to exercise reasonable care. Her failure amounts to "an act or omission respecting legal duty of an aggravated character as distinguished from a mere failure to exercise ordinary care. It amounts to indifference to present legal duty and to utter forgetfulness of legal obligations so far as other persons may be affected." *Smyth*, 207 F.3d at 762. The consequences of failing to recover the estate's assets were clear. The assets were easily reduced to cash as evidenced by Tina Schooler's use of the assets. The Trustee's several years delay in administering this case is not irrelevant. She clearly should have acted early on in the case. Her failure to act for the many years after the assets were gone merely

underscores her failures early on in the case. It evidences a lack of urgency throughout the case; it reflects a blatant and conscious indifference to her statutory duties. At some point, such indifference crosses the fuzzy boundary between negligence and gross negligence. The Court concludes the Trustee's conduct satisfies the gross negligence standard.

### 6. Liability of Liberty Mutual to Bankruptcy Estate; Attorneys' Fees

Given that the Trustee's conduct satisfies the gross negligence standard, and that in a hypothetical action against the Trustee, the Trustee would be personally liable to the bankruptcy estate, Liberty Mutual, as surety under the bond, is liable. The damages suffered by the estate are equal to the value of the lost assets. Upon the evidence before the Court, the value of the lost assets is $112,247.66.

LNB requests a judgment in its favor and directly against Liberty Mutual. The bond, however, runs in favor of the United States, and is to cover any loss resulting to the bankruptcy estate. It is not issued to cover specific creditors. The Court therefore directs that Liberty Mutual's obligation is satisfied by remitting the loss amount to the bankruptcy estate for ultimate distribution to creditors of the bankruptcy estate.

Finally, Liberty Mutual requests attorneys' fees of $28,438.58. The Court has not been cited to any authority that allows LNB the recovery of its attorneys' fees against Liberty Mutual. The request for attorneys' fees against Liberty Mutual is denied.

### Conclusion

As set forth above, the Court determines that the Trustee's conduct satisfies a gross negligence standard. Liberty Mutual's obligation as surety under the blanket bond is thereby

triggered. Such obligation flows not to LNB, but to the bankruptcy estate. The Court will therefore issue its order directing that Liberty Mutual shall satisfy its obligation by remitting the sum of $112,247.66 in favor of "The Bankruptcy Estate of Robert Dean Schooler and Tina Marie Schooler, Case No.01-51003."

### End of Memorandum Opinion ###